Page 16-1021 at all Sierra Club at all petitioners first the Environmental Protection Agency at all. Mr. Pew petitioners, Mr. Ray respondents, Ms. Freeman, intervenors. Page 16-1021 at all petitioners first the Environmental Protection Agency at all petitioners first the Environmental Protection Agency at all petitioners first the Environmental Good morning. Good morning. My name is Jim Pew and I represent petitioners. I'd like to first address EPA's emission standards for carbon monoxide which is the agency's surrogate for all but one of the organic hazardous air pollutants that industrial boilers emit and then turn to the agency's work practice requirements for periods of start up and shut down. Most of the 187 hazardous air pollutants that are listed in the Clean Air Act are organic hazardous air pollutants. Boilers emit, as I said, boilers burn a wide variety of very dirty fuels including mattress coals and also tires, scrap plastics, industrial sludge and not surprisingly they emit a wide variety of organic hazardous air pollutants. EPA's carbon monoxide emission standards are the only limit on these emissions, the only protection that communities have against these dangerous pollutants. In the 2013 rule, EPA replaced 13 of the 36 carbon monoxide standards that had been promulgated two years earlier with new and far weaker ones. Previous standards, the previous 13 standards and all the other 23 carbon monoxide standards that are still in the Industrial Boilers Rule, all satisfy Section 112.3 of the Act as before provision and in accordance with that provision they reflect the emission levels actually achieved by the best performing sources. These 13 revised standards do not. EPA refused to apply Section 112.3 to these 13 standards because they claim, quote, carbon monoxide is not a good surrogate, unquote, at the emission levels that the best performing boilers undisputedly achieve. If EPA does not believe that carbon monoxide is a good surrogate, the answer... Why don't you just clarify when you said it's not a good surrogate? That's the response to comments documented on page 31 of the joint appendix. So, Ed, can I ask you to explain your view as to what remains on this issue in the wake of the decision in U.S. Sugar? Because in U.S. Sugar, the panel said that the petitioners contend that the EPA's decision to use carbon monoxide as a surrogate was arbitrary because the record demonstrated a breakdown at these levels. And then the court goes on to say, but the EPA explained that this apparent breakdown was most likely caused by the difficulty of measuring the regulated half at such extremely low emission levels rather than by a flaw in the correlation between carbon monoxide and organic halves. This is precisely the sort of scientific judgment to which we must defer. So that's the predicate against which we take this case. Well, actually, I can mention one thing. Actually, the court had two rulings. On page 628, it actually found that EPA had not adequately justified carbon monoxide as a surrogate because there are a number of other factors that affect organic hazardous air pollutant emissions that don't affect carbon monoxide and vice versa. Or there could be. You're talking about the alternate control mechanisms? Well, not only could... Right. I mean, the court said that they would raise in comments. In fact, as in the record for this case, it's shown that they're raised in EPA's own statements in the Federal Register. EPA agrees that at least one organic hazardous air pollutant, polycyclic organic matter, or POM, is reduced further beyond what the standards do, reduced further by add-on post-combustion control measures, including fabric filters and wet scrubbers and activated carbon injection. But to get back to your question about what's left, following that rename, EPA is going to have to decide whether it can or wants to retain carbon monoxide as a surrogate. And if the agency decides that it wants to do so, then the question is, are the standards sufficiently stringent to satisfy Section 112.3 of the Clean Air Act and Section 112.2? I think we start under U.S. Sugar from the assumption that our court has rejected the broad argument that the data fuzziness at the low end completely precluded the EPA from using carbon monoxide as a surrogate. That's what we start with from U.S. Sugar. And now the question is, assuming it's using carbon monoxide as a surrogate, can it desist from using it when the combustion is closer to complete because of a little bit of data fuzziness? And I take your position to be that the parent breakdown was most likely caused by the difficulty of measuring rather than by a flaw in the correlation. They're saying this is a data measurement issue, not a surrogate is no good issue. And therefore, under that very logic, don't they need to carry it all the way through and use it to below 130? Is that your argument? I think I agree with you, Your Honor. Once they've chosen carbon monoxide as a surrogate, they need to carry it all the way through and set the standards for carbon monoxide that the statute requires. Unless it has a non-arbitrary basis for punching a hole in that reliance at low emission levels. And your position is that it doesn't. EPA, I guess, would come back and say, well, no, we don't have a basis for regulating at levels below 130 because, hey, look at the data. And your response to that is? I think I'm close to your honor, but I don't think that even if EPA can retain carbon monoxide as a surrogate because it has some basis, some non-arbitrary basis for doing so, even then, EPA's carbon monoxide standards have to satisfy the statute. There is no non-arbitrary basis. There's no lawful basis that EPA can simply excuse itself from compliance with the statute. Right. I think we're getting a little – I'm trying to get a little more granular than that. And one of the difficulties I'm having is that some of your briefs seems to be struggling against what I take to have been decided in U.S. Sugar, which is that carbon monoxide is not an arbitrary surrogate in general simply because of the breakdown in the data at the low end. And so it may be for the other reason, which is that there are other ways of achieving benefits, I might call it, into question. That's on me now. But in terms of if we're just looking at the world of carbon monoxide as a surrogate and then what I'm referring to as the data fuzziness at the low end, if that doesn't indict it as a surrogate in general, then your position has to be, okay, we'll take those terms, but it has to be used as a surrogate in general, including at levels below 130. Yes, that's exactly right. It has to be used as a surrogate. Of course, it's undisputed that EPA can use – can meet its underlying statutory obligation to limit emissions of the organic hazardous air pollutants. Other ways, EPA could use other surrogates. It could set direct standards for the hazardous air pollutants that boilers emit. And, of course, it's going to have an opportunity to consider that issue when it's responding to the remand. What it can't do is choose carbon monoxide as a surrogate but then refuse to apply Section 112.3 to carbon monoxide. And how is it not doing that? Well, there's no dispute that EPA's carbon monoxide standards are much less stringent than the emission levels that EPA determined the best sources are achieving. Those were the 2011 standards. But as to carbon monoxide. Right. Having chosen carbon monoxide as a surrogate, EPA has to set lawful standards for carbon monoxide. It's literally standard. But I guess even if the – it's true that EPA could, we know by virtue of its prior standards, have lower levels for carbon monoxide. It has. And, obviously, 130 isn't the lowest number. You could actually go all the way down to zero. So, just it's true that there's lower levels possible. But the statute doesn't treat with carbon monoxide qua carbon monoxide for these purposes. It's only treating with carbon monoxide insofar as it's a surrogate for some other half. Right? Right. So, EPA has chosen carbon monoxide as a surrogate. But the only way a surrogate works – and, by the way, every other time EPA has issued a surrogate, what the assumption is is that if it's a good surrogate and you set the standards for the surrogate, that is, in this case, the standards for carbon monoxide that are going to satisfy the statute, you also get the reduction in the underlying hazardous air pollutants that will satisfy the statute. But EPA is the one that's claiming that doesn't happen here. So, EPA is claiming that it's relieved from setting the standards from Section 112, that the Section 112.3 requires for carbon monoxide because it thinks it's not appropriate. Well, I don't think that's exactly their position, to be fair. They're saying we are meeting the statutory standards because to the extent that we have reliable data, we are requiring boilers to meet the standards of the best performing. And we'll hear from them what their position actually is. What I take your position to be is that the reason they can rely on a surrogate is because they have a reliable understanding of a chemical relationship between carbon monoxide and the organic half. That's why they can use data about formaldehyde to apply to other organic halves without specific data on the other half, because they have a general scientific or chemical understanding of how those things relate. And so, too, at the lowest level, the fact that their data has some fuzziness in it, I take you to be arguing, doesn't actually give you reason to think that that relationship, as a more sort of scientific matter, actually breaks down. It's just a measuring problem. Is that your position? I don't think so, Your Honor. We're happy if EPA wants to drop it. I understand you're happy if they want to drop it. But to the extent that there is not any other ground on which, and I know that's on remand, but to the extent that there is not any other ground indicting carbon monoxide as a standard, and therefore that EPA is committed to using it insofar as it can, I thought your position was, insofar as it can includes levels below 130, because even though they may have some fuzziness in these data, they have an understanding of combustion that supports using it all the way down. I think that's close, Your Honor. I would say insofar as they do. We take no position on whether EPA's rationale is correct there or not. We're simply saying, for whatever EPA's reasons are, EPA is choosing to use carbon monoxide as a surrogate. But if I can get back to your first question, I think that's a really revealing one. EPA did not actually ever claim that these standards reflect the best performers for the underlying hazardous air pollutants either. And that's what is so wrong with this. What EPA, and I should say that's a complete post-op rationale. EPA never claimed in the record that these standards reflect what the best sources perform with respect to organic hazardous air pollutants. All EPA ever claimed was that these standards reflect what can be achieved with a single control measure, which is carbon monoxide control. Right. Their theory why that reflects the best performers is, I thought, a tool in your toolkit for the particular issue before us on carbon monoxide in this case, which is they say they're persuaded that the relationship between carbon monoxide and the organic HABs is consistent and strong enough that when they control for carbon monoxide, they are effectively controlling for those other things. Therefore, they look at the best performers in terms of carbon monoxide, and they've done their job. Right? That's their position. Is that as you understand it? That's, well, I think their claim is simply this. You don't get any further reductions in organic HABs by lowering the CO level further. That's what they say in the record. On the 130th threshold. On the 130th. I think it's a more general matter. They're saying, you know, this is a reliable correlation. And then we get into this question about, well, why are they punching a hole in it at the lower level? Then they're saying their position is you don't get further reductions. They're saying they don't get further reductions. And so we have really two responses to that. One is under the statute it's irrelevant. If you've chosen CO as a surrogate, then you can set awful CO standards. The other is it's just not true. There's no basis for that in the record. In fact, the record shows that there are organic hazardous air pollutants at CO levels below 130 parts per million, which is the level of EPA standards, and that's at page 116 and 118 of the record, which shows clearly that there are organic hazardous air pollutants emissions at all CO levels. And the other, of course, is EPA's own statements that these organic hazardous air pollutants can be and are being reduced already by other control means. So these standards don't – I mean, we don't think it's the right legal test, but even if it were, these standards don't purport to reflect the best performance with respect to ______. But we have to take as a given after U.S. Sugar that I think that ______ asked for your reaction to this, that at levels below CO 130, there's – it's difficult, if not impossible, to measure the haps. I don't think that's what U.S. Sugar was holding. Okay. But there's one question that – I mean, what the record actually shows is that there are measurable – So I know you have an argument under the record, and I'm just wondering what flexibility we have given what U.S. Sugar says, and what is it in U.S. Sugar that doesn't approximate what I think? I think what U.S. Sugar was saying is EPA may have had – it may not have fully been able to explain what was going on at levels below 130 parts per million, but we're not going to let that stop us from okaying the use of carbon monoxide as a surrogate at those levels. We're going to defer to the agency on that point. But it didn't hold that, as a matter of fact, there are either no organic hazardous air pollutant emission levels or unmeasurable organic hazardous air pollutant emission levels of those. Why didn't it say the latter? I thought what we said was that the EPA explained that this apparent breakdown was most likely caused by the difficulty of measuring the regulated HAP at such extremely low emission levels, rather than by a flaw in the correlation. This is precisely this judgment being the judgment that there's a difficulty in measuring the regulated HAP at such extremely low levels. It's precisely the sort of scientific judgment to which we must defer. I think the question the court was trying to answer there is, had EPA explained itself well enough to justify CO as a surrogate against that particular argument and said, yes, there's enough explanation there, but it wasn't a factual finding that there simply are no emissions there. And, again, that finding would be completely out of the record here, which is that there are. So I'm interested, Mr. Pugh, in what you think EPA is talking about when it refers to carbon monoxide as a conservative surrogate. I'm looking at JA-16, and this is the 2013 January Federal Register, because carbon monoxide is difficult to destroy a refractory compound. It is a conservative surrogate for destruction of hydrocarbons, including organic HAP. What do you take them to be meaning there about it being a conservative surrogate? Well, to begin with, they're talking about one organic HAP. Their entire discussion is comparing carbon monoxide to formaldehyde, which is not only just one organic hazardous air pollutant that EPA never claims is representative of the others, but is not even like other organic hazardous air pollutants. I think you're fighting an issue that I don't take to be before us. Okay. So bracket that. So what do you take them to be saying about it being a conservative surrogate? Everything they're saying in that passage on page 16 of the Joint Appendix, and also in the response to comments, leads to the conclusion, their conclusion, that they can't get any further reductions in organic hazardous air pollutants by lowering CO levels below 130 parts per million. Is that their position? I didn't take that to be their position, that they can't get any further reductions. I took their position to be that they can't reliably measure further reductions, and I thought that was your whole case, that they can't reliably measure. But, hey, they don't need to measure, because as with going across different organic compounds, so, too, going down the scale to the lower levels, they have a relationship between combustion and organic HAP that they've embraced. If they really have embraced that, why aren't they embracing it with respect to levels lower than 130? I think that's much of our case, and I don't want to quibble with you if you agree with us. But they do say at page 16 of the Joint Appendix, and I think this is ultimately their conclusion, that their problem, the reason they want to set standards here is that they don't think reducing carbon monoxide levels below 130 parts per million would yield further reductions in organic HAPs. And the reason that that's wrong is that's just another iteration of the same unlawful floor approach that EPA has brought before this Court unsuccessfully time and time again, where the agency claims that it can pick a particular control measure and set floors at levels that it thinks is achievable with that control measure. So suppose conceptually that, to follow up on Judge Miller's question, if the EPA decides that carbon monoxide is a reliable surrogate, and one could say that one upshot of deciding that carbon monoxide is a reliable surrogate is that you should always try to reduce carbon monoxide as much as possible, period, because the supposition would be that that would necessarily beget at least some reductions into HAP, if not equivalents. But then suppose there's evidence that actually when you get below 130 and you start going even lower, and I don't know the chemistry behind this, I don't understand it, but maybe it's continued combustion becomes inefficient at that point or something, but then the underlying HAP actually goes up. Then that would be a situation in which it's not true that continuing to reduce the CO level necessarily is producing the desirable outcome vis-a-vis what we really care about at the end of the day, which is the underlying HAP, right? Well, that's right. And I think if EPA really determined that it is futile to set the standards the statute requires for carbon monoxide, it needs to abandon carbon monoxide as a surrogate, which it can do. So that's your answer to that? Because I thought there actually was evidence. I can't remember. I thought there was some evidence in the record to the effect that when you go below CO130 that actually it can result, was it formaldehyde, that actually it can result in some increase on the underlying HAP. EPA did make that claim. Our point is just that it's EPA's choice about whether it wants to use carbon monoxide as a surrogate. Having done so, if it wants to persist in using carbon monoxide as a surrogate, those standards have to satisfy the statute. But we're not insisting that EPA, you know, keep CO as a surrogate or that it ratchet. We're not saying that the solution has to be ratcheting down the level. The CO level. The CO level. What we're saying is EPA's got to set lawful standards, and if it's really EPA's intention that setting lawful CO standards is futile, the agency needs to look elsewhere. So your answer to the proposition that reducing CO still further might actually have an adverse effect on the level of the HAP, well, then that just teaches you that you shouldn't use CO as a surrogate. Yeah. That's an excellent reason not to use CO as a surrogate because, as the court held, the whole point of a surrogate is that you get the reduction in the underlying organic HAPs that you're supposed to get by setting the lawful standards for the surrogate. So before I move on to the other points, I'd like to say EPA standards also don't satisfy Section 112.d.2. They don't report for a flight the maximum degree of reduction that is achievable considering costs in organic hazardous air pollutants. Let me just briefly touch on the point that EPA's claims, both about compliance with Section 112.d.2 and 112.d.3 and the agency's briefs, are post-hoc rationales. There are no claims that these standards reflect either the best sources or what is achievable with the best sources. May I move on and talk about startup and shutdown? I realize I spent a lot of time on it. Thank you, Your Honor. Just very quickly, the importance of these startup and shutdown standards is that these are periods of time when boilers are allowed not to operate their controls or burn clean fuels. And controls are so effective that when they're engaged, they can reduce pollution by 99% or more. So when you turn the controls off, emissions can go up 100-fold. Even a few hours, which is what we're talking about here, at those elevated emission rates, can put a lot of very dangerous pollution into people's communities. Now, the greatest problem, I think, with these work practice requirements that EPA established is that EPA set work practice standards for all boilers, even though the agency admits that some boilers can engage their controls, meet emission standards, and measure their emissions during that time period. Section 112H makes it very clear that EPA can set work practice standards only for a particular class of sources to determine if there's a particular class of sources that cannot measure its emissions. EPA hasn't met that prerequisite for setting work practice standards instead of numeric emission standards. And this matters because Congress wanted numeric emission standards. Whenever it's feasible, for a good reason. They do much more to protect people from the emissions that come out of these boilers. And here, where EPA has found that it's feasible for some boilers to measure their emissions during the 10-to-4-hour startup period, the agency lacks authority to exclude all boilers or to exempt all boilers from meeting emission standards and to allow them to meet work practice requirements instead. Even if EPA could lawfully set work practice standards for these time periods, the standards that EPA set are not consistent with Section 112D, as Section 112H provides they must be. Section 112D standards have to require the maximum degree of protection that's achievable, and to be consistent with that, work practice standards have to do that, too. EPA agrees with this. EPA standards don't do this for at least three reasons. The first reason, on startup, is that they don't require the use of clean fuels. Surprisingly, EPA claims they do require the use of clean fuels, but if you look at page 98 of the Joint Appendix, it states very clearly that these standards allow sources to burn fuels, quote, that are not clean during startup period. Second, these standards, with the exception of, you know, PM controls, these standards' only requirement is that sources, each source, engage controls as quickly as is possible for it, and that sort of requirement for each source to do what is possible for it is exactly the same as the general duty requirement that this Court found objectionable in the startup shutdown malfunction case. That is, there, there was a requirement that each source reduce emissions as much as possible, and here, EPA is telling sources that they have to engage controls as soon as possible, and its rationale is that, well, in a situation where the only thing you're doing to reduce emissions is engaging your controls as soon as possible, engaging your controls as soon as possible is reducing your emissions as much as possible. This Court made clear in the startup shutdown malfunction case that that kind of general duty is not a Section 112d compliant standard. It's not, it didn't hold that EPA couldn't set work practice standards, but work practice standards have to be consistent with Section 112d, and if they aren't, a standard that is not Section 112 compliant can't really be section, you know, consistent with Section 112d. At the very least, EPA had to explain why it thought that this general duty requirement was consistent with Section 112d, and in fact, EPA admits in the record that general duty requirements are not appropriate for work practice requirements. That's page 13 of the Joint Appendix. The last problem with these startup standards is that what they require is for each, for each source to engage controls as expeditiously as possible with its current assembly of equipment and fuel and control equipment is not the maximum degree of reduction that's achievable. EPA states in the record, and again, it is briefed, that it wanted to make sure that it accommodated each existing combination of boiler, fuel, and control, but that's not the point of Section 112 maximum achievable reduction standards. The whole idea is to reduce hazardous air pollution emissions, and that may very well require sources to install better controls or update their equipment. EPA could certainly find that that's unachievable for some reason, if it wanted to do that, but that's not what happened here. Instead, EPA set itself a completely different test, which is simply what can every source do with its current collection of equipment and controls. The last point is on shutdown. The other big period when there are uncontrolled emissions are during shutdown. EPA claims incorrectly in the record, and even if it's briefed, that these standards require the use of clean fuels during shutdown. Again, on page 98 of the Joint Appendix, it makes very clear that they do not require the use, they allow the use of fuels that are not clean. I read that you're challenging only, there's this two-part standard, and you're really only challenging the extended version. Yes, we're not challenging EPA's standards for the startup period before boilers start supplying useful thermal energy. We're challenging the period after that and, of course, the shutdown period. As I read the record, I thought that EPA's position is that just having the standard, the single standard that I gather is the standard that you would want to have left in place, that the controls have to go on when the facility is producing useful energy, that that was not workable. They wanted to create sort of a safety valve with the duty of record-keeping for those facilities for which that standard wasn't workable. I take it to be that information gathering is so that they might tighten up that standard with more information about those facilities that aren't able to meet the useful energy baseline. I think I generally agree with you, but EPA went further than that. It's done expressly in its brief in case 38 and also in the record in case 352 and 353 that some boilers can engage their controls. Some, but then they're saying maybe some can't. Right, so what it has is a situation where some can and some can't, but the statute says EPA has to determine there is a particular class of boilers that can't. So you're saying they really should have done more work in their duty to classify, that they should have sort of an effective sub-classification of those boilers that can't meet the useful energy baseline and then probably get a different rule for that in the 4-hour. Yes, it is really true that there are some boilers that can't measure their emissions in that extended 4-hour period. EPA certainly could set work practice standards for them, but it can't simply say some boilers may not be able to do it, we don't know, so we're going to set work practice standards for all boilers, even though we know that some boilers can do it. And, of course, the other problem is that this rule allows each boiler to choose for itself. A boiler that can engage controls and meet emission standards as soon as it starts up nonetheless has the option to elect this extended 4-hour start-up period when it doesn't have to. Although it doesn't have business incentives to do otherwise. It wants to get going. It wants to start producing useful energy. Oh, it would be producing useful energy and making money. What it wouldn't be doing is paying to operate its controls. So you're saying everyone's just going to choose the 4-hour? I don't know if they will or not. There is more of a regulatory requirement if you choose the 4-hour option, right? Well, no. I mean, they don't have to meet emission standards. I thought there were extra reporting requirements. Oh, there are reporting requirements, but I think that given the choice of meeting emission standards or reporting, I think sources will choose. Some sources who could actually meet emission standards will choose not to. All right. Let's hear from respondents. Good morning, Your Honor. This is Norman Ray from the Department of Justice representing EPA. We have a counsel table that was submitted today from EPA's Office of the Attorney General's Counsel. So let me talk about the one-third parts per million. And I think the court pretty well understands EPA's rationale. And there is a history here, Your Honor. In the original 2011 rulemaking, EPA chose carbon monoxide as a surrogate because it believes that combustion control is the only effective control for tasks at these types of facilities at these types of concentrations. And it found on the record that there was a strong correlation between carbon monoxide concentrations and concentrations of tasks based on the data it had with, as we've discussed, some breakdown at the lower level. And that makes sense from a chemistry perspective because when you burn fuel, when you burn coal or wood or whatever, the process involves taking large organic molecules, breaking them down into smaller and smaller pieces by adding oxygen to them, and then the last, sort of the second last step in that process, and one of the most difficult ones, is to create carbon monoxide. And then the final step is to add the final oxygen to create carbon dioxide. So that, as you're, if you have low carbon monoxide levels, that means you're driving combustion as completely as possible, and that's why carbon monoxide from a chemical point of view is a surrogate. Then in response to comments after the, or petitions after the initial rule was promulgated, a number of, a lot of data was presented to the agency saying that, you know, the agency, when it originally set the standards, it followed the, it used the 112, it did 112.33. It listed all of the emissions of carbon monoxide. It looked at the bottom 12 percent and did that analysis, you know, fairly mechanistically, and set varying levels of carbon monoxide based on the best performers in each of the various subcategories. But it received a number of comments saying that at these very low levels, and below 130, the different levels of carbon monoxide were sort of random, that they were not associated with further reduction. Now, is that a fair rating of the data? No, because I thought most of the data points were consistent with the general, the general analysis, which is that most of, there's sort of a spray, if you will, of data points that pop back up at the low level latent combustion, but most of it, there are many data points that are fully consistent with EPA's general understanding of the relationship between the carbon monoxide and the CO2 impact. Above 130, certainly. Below 130, they did a new analysis, and the analysis ended up, now this is discussed at January 15th and 16th and elsewhere, which is the proposed, the January 13th proposed rule. They determined that below 130, that there wasn't any further, what they were seeing was essentially sort of random, and it was not further reductions below 130 percent. No, as I read it, the agency said on page JA-16, we are aware of no reason why carbon monoxide concentrations would continue to decrease and formaldehyde concentrations would increase as combustion conditions improve. They think that the measurements, the difficulty of measuring allows for this slight increase, not a chemical difference in the relationship. That was how I understood the EPA to be saying, we're having difficulty measuring, and that's also the position that this court accepted in U.S. Sugar, where the court said, you know, we don't think this impugns carbon monoxide as a surrogate, this data fuddiness, because the EPA has explained that it's a problem with measurements. Well, yeah, that was in 2013. In 2015, the agency has determined that there is no benefit in driving combustion. But our task is to say, based on what? It's based on the data in the record that shows that there is no further benefit to reducing carbon monoxide. It's not associated with a further reduction in half emissions. Where is that in the rule, in the proposed rule? It wasn't in the rule. It was promulgated in 2013, and then they granted reconsideration to take notice in the comment. And they made that determination that there was no benefit, in part because of the measurement and in part because they just don't believe there's any further reduction. Yeah, where's the best distillation of that point in the EPA materials? Let me find that chart. Okay. That is my understanding of EPA's position. I'm going to ask you the same questions that I asked Mr. Pugh. As I understand the agency's position, it is non-arbitrary for the agency to regulate, even without specific HAP-specific data on the use of a surrogate for control of that HAP, where the agency has sufficient sort of chemical or scientific understanding of the relationship. And so, here, the data is data about formaldehyde. That's not the only data, Your Honor. Formaldehyde happens to be the chemical on which they have the most data. But there is additional data. And all of this is mostly discussed in the 2011 rule. Right. So there is data concerning a wide range of HAPs. Right. It's just that the bulk of the data is formaldehyde. Right. So there's data and there's an understanding of that data. Both things are correct, Your Honor. That derives from an understanding of combustion and what it produces and when there's carbon monoxide and when there's carbon dioxide and how the presence of those two carbon forms associates with the destruction of organic HAPs. Right? Yes, Your Honor. And so the agency has taken a general position about the relationship between carbon monoxide and the organic HAPs that it has a duty to regulate. Right? A general relationship between carbon monoxide and the HAPs subject to regulation, which is the less carbon monoxide, the less HAPs. Right? Level of carbon monoxide, a good surrogate for HAPs. Yes, Your Honor. Then it turned around in 2013 and said, actually we are not going to rely on that relationship. We're not going to carry that relationship all the way down below the 130 parts per million level. That's right. And my question to you is why not? It's because they determined that below levels of 130 parts per million, there really is no further combustion of organic HAPs occurring. You're not getting any further reduction in organic HAPs. Although we have data showing that in many cases there was. Some of it's higher, some of it's lower. There isn't a relationship. But there was a lot of data showing that there were lower levels achieved. Lower levels of carbon monoxide. At further combustion. In some cases it's not. Partly it's a data measurement problem, but also this appears to be a chemistry problem. But that's the question. I don't see anything in the record explaining what you refer to, and it's helpful to me, refer to as the chemistry problem. In fact, the only thing relating to that that I see is on the first column of JA-16, we are aware of no reason why CO concentrations would continue to decrease and formaldehyde concentrations would increase as combustion conditions improve. And so it just seems like you have a general understanding of the chemistry and then you have what the EPA in many aspects of this case has described as a data blip. Not a functional chemical change, but a data problem. And then it's saying, but we're going to treat it as if it's a chemistry problem. And that's where I find the hole to be. And I'd love your help in giving me the chemistry answer to that or pointing me to it in the record. I think that would be looking for the same thing that I was asking about, which is where's the explanation that it actually disturbs the objectives to push carbon monoxide still lower. I think I'd refer you to the report at 208 and 209. I think we're in session. You're in appendix 208? JA-208. It discusses the value of why carbon monoxide is not a good solution. Is that? I see exactly, and I have marked, and I have questions in my margin. Because what it says is the trend can be seen, and we're talking about the same data that the rulemaking is talking about. At levels lower than 150 parts per million, the mean levels of formaldehyde appear to increase. Yes? Suggesting a similar breakdown in the carbon monoxide-formaldehyde relationship. I don't take that to be giving us any kind of insight into whether that is a measurement problem or whether there might, in fact, be some kind of chemical phenomenon going on there. And as I think Judge Srinivasan's question suggested, if there is, then not only should you not push the bottom levels of CO down, you would be forbidden from doing that because you would be acquiring the generation of more, perhaps, no? So it just seems like this black box needs an explanation. It doesn't, and I can't come up with the record for text right at the moment. This wasn't really an issue that I think was very well addressed. That was really the focus of the petitioner's argument, but I don't think we really addressed it in our briefing. But that is certainly my understanding that that is the agency's position, is that there's simply no benefit to having levels below 130. Can I ask a broader question, which is, would you agree, or would the EPA agree, that the goal is to get to the lowest level of the HAP possible? And the reason I ask that is because on page 22 of your brief, there's the point that even if the lowest admitting was the measure of best performing, which the agency did not agree with, the 130 ppm threshold met that standard, which was page 22 of your brief in the middle of the page. And maybe I'm reading this out of context, but it says in the middle of a sentence almost exactly in the middle of the page. You are reading that out of context. Okay, what am I missing in that? Because it makes it sound like you don't necessarily subscribe to the notion that getting the lowest would mean getting the best. No, because what they're saying, this is in response to a comment or an argument that petitioners made that EPA had, petitioners, there had been comments pointing out that EPA should look at the lowest level of the carbon dioxide as associated with the lowest level of formaldehyde emissions. And what EPA is saying here is they didn't believe that that, looking at the lowest level of half emissions associated with carbon monoxide was an appropriate measure. And that if they hadn't in fact taken that approach, they would have set the standard at 240 ppm. Rather, EPA believes that the relationship of half reduction and carbon monoxide reduction goes down as far as 130 ppm. So this was a response to, and the brief is a response to an argument by petitioners that we think mischaracterized statements that EPA had. But this is, I think, further driving me toward the question that I find to be central and that I'm still struggling to answer, which is EPA is not saying that when we get down to these, you know, further along these combustion process, we're going to jump the tracks and not rely on carbon monoxide. Instead, rely directly on formaldehyde. This is saying we're not doing that. No, what we're saying is these are the best performing sources and this is the best anyone can do. And you're defining best performing sources by adhering to your surrogate choice, which is carbon monoxide. Right. But there's no other way to measure it. Right. And so when, and you say, indeed, had we jumped away from surrogate and directly measured, it would be a higher number. It wouldn't be 130. That's right. Right? It would be 240. That's what this response was saying. But that seems like you're kind of trying to have it both ways. If the reason you've abandoned a surrogate for which there is a strong chemical case, which has to do with combustion and the completeness of combustion, it strikes me that without some affirmative reason to do so, you need to stick with that all the way down, notwithstanding a bit of fuzzy data. I guess that's a good point. I'm sorry that I can't come up directly. Maybe at the end of the argument we'll come up with something. But EPA's rationale here is, in fact, that there simply is no, the best performers are represented by the level of 130 parts per million. That is the level at which you achieve the lowest emissions of hazardous air pollutants, which is what the statute says that EPA is supposed to do. Section 112.2 specifically states that emissions standards require the maximum degree of reduction in emissions of the hazardous air pollutants subject to inspection. I mean, that's the flaw in the petitioner's argument that we should have, that 112.3 requires EPA to set carbon monoxide standards at levels below 130, because what EPA, the statute, 112.2 is the overarching standard for how you set standards. 112.3 just fleshes out what it means by maximum degree of reduction. But the goal here is to set the standard at the level that achieves the maximum degree of reduction of the hazardous air pollutants. And the hazardous air pollutants here is the organic half. And EPA has determined that the maximum level is achieved at 130 parts per billion. So based on this data, could EPA have said that as combustion progresses, once the emissions of carbon monoxide reach 130 parts per million, the boiler is obligated to maintain that out of concern that if it falls lower, that could be producing unnecessarily high levels of organic half. I don't know that the data would support that or not. But I think what EPA has determined is that there's simply no, there's a lot of the data, it bounces around, it seems to be very context specific, and they don't have the data. Is there any sense of it? We certainly have no data that shows there's any benefit to it. I just have one more question, which is about, it's the same question that I asked Mr. Pugh, which is what does EPA mean when it refers to carbon monoxide as a conservative surrogate? And I'm trying to get here whether there is some kind of, again, chemical reason for this phenomenon. And this is in the very middle of page 16 of the joint appendix, because carbon monoxide is difficult to destroy refractory compound as a conservative surrogate. Does that mean that the level of destruction of carbon monoxide lags behind the level of destruction of the organic half? Exactly right. Why? Because it's a tougher reaction to drive the carbon monoxide, the carbon dioxide requires more energy, requires more, it's tougher. The chemical reaction, how fast the chemical reaction takes place depends on a lot of different factors. So that might be in one of the technical reports. You know, Judge Pillard is looking for some explanation. Right, and that goes, again, that goes back, there's explanations of that back in the records of 2011. Right, I understand, but I'm just saying that type of thing. Yeah, no, certainly that explanation is there. It's just that the chemical reaction, breaking apart these larger chemicals is easier energetically, it's easier in the system of combustion than it is to form carbon dioxide from carbon monoxide. These things happen in steps, depending on which bonds have to be broken, which chemicals have to be added to what, add carbon monoxide. If combustion was 100% complete, all you'd have left would be carbon dioxide, assuming you started off with the fuel that was pure carbon. Can I switch gears just slightly for a second, which is there's usually when, as I understand it, when EPA develops a standard, there's a question of developing a floor, and then there's the possibility of doing something beyond the floor. Yes, sir. And in this situation, I didn't see much in the record explaining why there wasn't an effort beyond the floor. All that was supposed to be addressed in the 2011 rules. The reason this is a very narrow issue is because it's an issue that was severed from the U.S. sugar case. So it was beyond the floor, not even within the scope of the severance? No, Your Honor. The only issue that was beyond the floor was the setting of the 130 parts per million floor. That was the only issue that was done. And then you don't view the part to be severed to be not just the 130 floor, but whether it was possible to do something beyond the floor? Well, Your Honor, the question of whether it was possible to go beyond the floor standard, for instance, was considered in the 2011 rules and should have been raised there if they were going to argue that there was something else that could be done. I mean, the answer is no, as long as it isn't that kind of technology or any other form of technology. Well, I don't know that we know that yet, because isn't that part of the remand? That is part of the remand, Your Honor, is whether there is some effect. You know, certainly EPA's assumption and EPA's belief based on its expertise in setting the carbon monoxide standard is no, it's not. For these types of systems, for these levels of air pollutants, that combustion, if you achieve these levels of combustion control, 130 floors... But the whole point of the remand, I thought, was that it's supposed to assess whether there's other technologies that would further serve the cause. Well, the remand is to explain why EPA decided that there was. Yeah, you're right. So, in theory, it could just be an explanation. So, the question is, I mean, what EPA has is a data set that shows, you know, half emissions and carbon monoxide emissions, and they correlate well down to 130 parts per million. And EPA sets the standards. So, the question is, is somewhere buried in that correlation, is there also some effect from other types of pollution control equipment, which the agency, you know, sort of unspoken assumption in the original rulemaking was that there's not. But that's the issue that's been so big there. If it's okay with my panel members, I'd like to request that, if there is somewhere that you can identify, you said on the 2011 letter, there was more explanation of the notion of this being a conservative surrogate that you thought might actually help explain why the EPA thinks that there are no further control deficits to be gained below the 130. No, the issue that was addressed in 2011 was just the general... I know, but then it's alluded to. I thought you were saying, in response to my question, that why is that a response in the 2013 rulemaking? Maybe it's not. Why is that a response to the notion that there's no reason why carbon monoxide concentrations continue to decrease and formaldehyde concentrations increase? I don't see anything in the record that explains that, and yet the EPA is acting as if that's a fact. Okay, I believe you're right. There's certainly something on the general principles of what the EPA... This would help. I didn't see it in the disjoint, I think, but it's just access. And there may be... The whole issue of the appropriateness of carbon monoxide is litigated in your... That I understand, but I think you understand where we're focusing now and what the problem is. If there's anything that you think would be helpful, and of course, if there's anything Sarah could like to say in response, just a letter, I'm just talking about coming to the record, not briefing, but just, you know, what you think illuminates that. But I want to be clear what the question is that we're asking you to respond to, all right, and distinct from what's being addressed in U.S. sugar. I'm sorry? I would like to be clear as to what question you are being asked to respond to. My understanding is what I'm looking for is some explanation of why we refer to carbon monoxide as a conservative source. That would be relevant to whether the relationship between it and the organic half would break down... Below 130. Because as I take your general position, there's a chemical relationship that makes it a good... Very good. Cross, half, and at different stages of firing, and then this feels inconsistent that the EPA is taking this different position, and I want to understand if there's a cross-cutting chemical principle that the EPA has invoked. No, not why there's 130. Not in the earlier rulemaking. We'll see if there's anything else in this rulemaking. Then forget it. I'm serious. I don't know this for a fact, but this is the type of thing that would be in a technical report that's part of the administrative record describing this chemical reaction, etc., and if the petitioners haven't raised it in this case as such, then there would be no reason for EPA to put it here, but it may be in the 2011 administrative record. Somebody would have to do some searching. We will see if there's anything else. All right. But you don't have anything in the rule itself that addresses this point, which is that when you go below 130, it's not just a measurement problem, because if it's just a measurement problem, it could be that the chemistry still continues to work, that actually the levels of the HAP continue to go down at the level of CO2. I think there's extensive comments on that issue as well. Right. Other than the sort of summary statement on JA-160. There is more information, but this wasn't really the focus of any of the briefing in this case, so I don't really have it off the top of my head. But what I'm trying to understand is, I thought in U.S. Sugar, one of the things the court was focusing on, some comments were made, some data was submitted about additional control. So on remand, that's what the agency is supposed to be addressing. That is the remand you're on. But that's a public-sector issue. That's right, but presumably this type of issue might come up in that context, so we might get some further information. That's all I'm trying to understand. Let's see. Where are you, Mr. Ray? All right. Are there any other questions on sort of the legal argument about the 130 parts of the measurement? Okay. If not, I'd like to talk about startup and shutdown. Yeah. And first of all, let me make one thing that I think I'd like to make clear, that startup and shutdown, a startup process has two purposes. One of the purposes is to bring the temperature of the boiler up, which has to be brought up fairly slowly because of expansion and contraction of the metal pieces, like the sort of radiator and banging, clanging, because the metal liberates the water boiler. And that has to be done over a period of time. But the other part of startup, and the reason why the petitioner's emphasis on clean fuels is misplaced, is an integral part of the startup process is to convert from some initial startup fuel, which is required to be a clean fuel, to the actual operating fuel, whether it's wood or coal or something else. It's like starting a fire. You can't just take a big log and light a match and hold it under it and get the fire started. You have to start something else. By the closest analogy of a fireplace and a gas jet. I think you also heard, Mr. Pugh had a question about whether, and you just said, it is required to use clean fuel during startup. Mr. Pugh said that's what the EPA said in his brief, but that's not how he reads the rule. Can you clarify your position on that? Certainly, Your Honor. And again, this has to do with these two phases. And the actual regulation is in page 98 of the Joint Dependent. That's the work practice standard. And it's up at the top. It's five. It says these are the standards when you start up a boiler. And the first one is you have to operate all of your CMSs, which are your continuous monitoring systems. And then it says for startup, in other words, when you're first getting the thing going, you must use a clean fuel. So it becomes the initial part of startup. And then, but at some point, inherent in the process of starting up, means at some point you have to start feeding in the fuel you're actually going to burn. Because you might start with natural gas or some sort of oil, just like you're starting a fire in a fireplace that has a gas jet. You might light the gas jet and start feeding the logs, and at some point you turn off the, but still, it takes a while to get going. And there is a period when you are getting the, part of the startup period is getting the working fuel up to a self-sustaining temperature and getting it going and then gradually increasing it up to the point where you get the working temperature of the boiler, which has to be done over a period of time to avoid damage to the boiler itself as different parts of it warm up, they expand at different temperatures. And so there is this, there is a period when you are first getting it going and then you use gas or some other liquid fuel to get your main fuel started and then you gradually get that fire going. And during all this early period, the system is very unstable. You don't have consistent flow up through the draft. It's not at the operating temperatures that many of these control equipment contribute that. So just on the narrow issue, what you're saying is that any fuel other than the running fuel has to be a clean fuel. In other words, the kindling. The kindling, right? Exactly. It has to be a clean fuel. And then so you're saying, well, during the entire startup process, there are going to be some tires or some wood or some pellets or something else. Correct. But the kindling type fuel does have to be. Does have to be. And so then, in EPA, that's why EPA decided that it had to do over practice because the conditions during startup, when you're bringing the temperature up, when you're gradually increasing the amount of fuel, your working fuel, the conditions are unstable and you can't measure emissions reliably. You can't do a stack test. You don't have the right conditions or the right time. And even continuous emission monitors aren't designed to work under it. So the EPA made the determination for the entire class, for the category, that it was not possible to measure emissions and therefore, it can work past the standards as necessary. What about Mr. Pugh's argument that I take to be, in effect, the category, which is something that EPA defines, right? Yes. Why shouldn't it have created a subcategory of those boilers that needed the four-hour phase period to get rid of what he sees as a moral hazard problem of everybody's going to want to use the boilers? First of all, that assumption is probably incorrect because, in fact, the extra monitoring and record-keeping requirements associated with the four-hour period are pretty burdensome. Do you have people exercise, have boilers exercise the first option? Yes, sir. I can't tell you what numbers, but some. And EPA, the four-hour period is based on an analysis of both electric utility boiler data sets, because they had that data available, but also confirmed by looking at industrial boilers, several hundred and something, showing that the best-performing 12% of sources achieved stable conditions that allowed them to engage their sources within four hours of when they started to produce usable energy. Presumably, there's some period before that when they're still burning. You know, they're using, of course, the clean fuel, the start-up fuel, and then the point is that the boiler, the best-performing sources had a period of about four hours from when they were able to reliably produce enough energy to run whatever industrial process they're using the boilers to run and had sufficiently stable combustion conditions to enable them to... Is there a substantive reason to allow a boiler that could comply with the first option to nonetheless have the second option? It's more a matter of... First of all, EPA, and this is in response to a comment, actually, did express some skepticism as to whether boilers at that... Immediately upon starting to go, could reliably measure it. But also, they just have no information as to what falls into one category or another, what boilers, what types of characteristics. They have no way to promulgate these rules. So this is kind of an interim, in a way, interim measure saying we're going to get that information through the record-keeping requirement. That's exactly right, Toronto. These rules have to be reviewed every eight years under the statute. And that's the purpose of requiring these extra monitoring and reporting requirements to enable them to decide if where is this the right time, if there are other things that can be done, and if there are some... But they don't... These boilers are a very heterogeneous group. I mean, EPA, I think, promulgated over a dozen subcategories just based on fuel types. So they have different designs, they have different abilities to utilize gas or other fuels. They have different sizes. They're putting up different kinds of equipment that are in different parts of the country. There's just no... They have no basis on which to say, you know, in this category. And remember, the determination that the start-up period is much longer than this four-hour period after they start to have initial energy. There is the initial period of starting with the clean fuels and the whole process of feeding the... gradually feeding in the operating fuel to bring it up to temperature. And EPA's decision that their work practice is looking at this process as a whole. And it just... There's no reason to divide it up between this last hour. It's a process that can take half a day or a day. It's a lengthy process. There was no basis for dividing it up along the period. And you're running expeditiously as possible. Number one, it's only part... One part of the suite of standards, in this case, is readily distinguishable from zero. There was no regulation on the period of entry. There's clearly a work practice standard. It involves a number of requirements. If you look at the four-hour one versus season two, they have to... There is a hard limit of four hours. Particulate matter controls must be engaged one hour after they first start putting in their operating fuel or non-fuel. So that can be well before they start... That could be before they start providing municipal energy. There are monitoring requirements. They have to have a start-up plan. This is not just to do whatever you want. And expeditious as possible in order... Because, again, every system is different, and you have to... It's based... When they can implement their control, it's based on when they achieve stable operations and when they achieve certain levels of flow, pressure, and temperature. In your view, could EPA have had the four-hour definition without the shorter option at all? Yes. And so one way to look at this is that's the rule. And then you have an incentive of relieving people of record-keeping requirements if they can start to come into compliance as soon as they are producing useful fuel. Right. And I think that's probably the better way to look at it. But that's certainly how the analysis... And some of it is this, where we started with the first one and then added the second one. So it's just... But just in terms of conceptually, whether we think of this as you have a rule that you then punched a big hole in, you could flip it and just say, well, you have a rule that you then also tighten up for certain... And I think that's a better way to look at it, because the four hours is based on doing a max-floor analysis of looking at the data they had available and how long it took facilities. Some of the data was from electric utility boilers, but they are... It's the best data EPA had, and it is consistent with the data that they had from... So anyway, that shows the best-performing sources. The 12% of best-performing sources, which is what the statute requires, could get their controls on in four hours. So I think you're right. That is probably the better way to look at the rule. And the issues regarding shutdown are really just the corollary to the issues involving startups. You have to slowly bring the system down. You have to put the fire out. You can't just put it across, because again, you have the same issues of contraction and expansion. Well, again, the issues are a little different because you don't have this four-hour extension period. It must be more stable than the shutdown. No, well, there's nothing to really measure from. Shutdown is just shutdown. You obviously have an incentive to stop burning fuel economically, but at the same time, you don't want to keep burning fuel  You want to bring the boiler down as fast as you can in order to save money, but you have to bring it down relatively slowly. And I think usually it's sort of a reverse process to stop heating in. Less of the regular fuel, and in the end, you might use additional clean fuel to smooth out the process of bringing the temperature down. So it's the same issue, Your Honor. There's no way to reliably measure emissions. There's no stack test. There's no conditions that are too unstable. And again, it's a highly variable process, and there's no way to specify anything beyond what's in the sun, which includes limiting requirements on what you have to run with. Anything further? Any further questions, Your Honor? Thank you. Counsel for interview? Good afternoon. May it please the Court, I'm Lauren Freeman on behalf of the Intervene of Respondents  is my co-counsel, Felicia Barnes. I want to spend my five minutes or however much time I have focusing on the clean fuel issue and the sort of shutdown work practice standards, but before I get that with your indulgence, I'd like to just add a couple of points on the two prior issues. On CO, I understand that you'll get some information from the government to clear up where in the record that combustion calculation is reflected, but I would point you to a couple of places where in Intervene of Respondents brief, we cite to the comments, which I think provides the basis for the more summary statement DPA makes in the preamble. And that's on, I think it's pages seven to ten, but I focus on probably the last paragraph of that section on page ten where we cite to the technical reports that you would anticipate there would be and comment. And on the petitioner's argument, as I understand it, they're not taking issue in this rulemaking with the surrogacy. That was the U.S. sugar case. Their issue is a very simple issue and I think it's incorrect assumption that the statute itself requires EPA that once they choose a surrogate that they follow the strict language of the provision that says that you have to maximize that. And we think that's an incorrect reading of the statute that the maximization requirement clearly refers to the HAP and not to a surrogate. The surrogacy is really, you know, a court, an EPA made concept that has been accepted by the court and not one that Congress probably anticipated in the language. So I think their issue is completely different. Well, it's right at the heart of what we've been struggling over, which is if the rationale for using something as a surrogate is not shown to  then the question becomes what counts as showing it to be inapplicable or bounded in some way or, you know, crossed by some other factor. And so I think that's really where at least where my thinking is focusing. And one thing I would point to actually in their brief I think is the footnote on page 5 where they talk about what the court has said about the use of surrogates and pointed out that it's not necessarily a direct linear correlation between two things. And in fact what I think DK has determined is that it is not in the case of COs one of those that have a direct          it's not in the case of COs one of those that have a direct linear correlation between the use of surrogates and pointed    case of COs one correlation between  use of surrogates that have a direct  correlation   surrogates and pointed case of COs one of those that have a direct linear correlation between use of surrogates and correlation between use of and pointed case of cases of COs one of          pointed cases of COs one of those that have a direct linear correlation between use of COs and pointed cases of COs one of those          cases of  circled case of the x and the y or the y spouse for certain circumstances and up to a  level. They aren't arbitrary to be maintained at that level. I agree with the beginning of that premise but I think their conclusion is wrong. Their conclusion is that it doesn't work at that level. It doesn't mean they get the statute required. I think that's an interesting thought exercise. Let's just say that carbon monoxide works as a surrogate and then it doesn't work as a surrogate. There's a boundary there. EPA needs to set other standards. Or as industry suggested they need to show there's nothing. And obviously they can't do that. Or it's the best they can do. If there's nothing else that can possibly be done I'm not sure how the statute requires them to do the impossible. EPA says there are things that can be done. They can use add-on controls. But it's also relevant to the stringency of the standards because it shows that more can be done. And the last point is just that the claims that these are the best performers are missing from the record. EPA doesn't cite any part of the record. On the shutdown points, EPA is essentially saying it didn't have enough information to draw a line between the sources that can actually meet emission standards and the ones that can't be emission standards. This is just dealing with the extra four hours. The first point I'd like to make is about whether there's clean fuels required. On the shutdown, it says if you choose to comply using definition two, once you start to feed fuels not clean, you must send emissions to the staff and so forth. So plainly, yes, it does allow sources to burn fuels that are not clean. The same is true for shutdown. But I understood that to be, you know, with the benefit of E.K.'s argument that the whole point of startup is that you're getting to a point where you're operating as you normally do, which is not with clean fuels. So it's like making a fire in my fireplace. I start with kindling. Let's say kindling is clean, which is not. But let's say that's the clean fuel and the logs are dirty. I use only kindling rather than some dirty fuel to start my fire. But the point of my project is to start my fire. So I'm going to put logs on there. And then when I'm fully started up, I only have logs. So why is that not the fair understanding of what this is talking about? Why is it not the fair understanding of what that is? Why does it have to be a lot of  Why does it have to be not all logs but lots of logs? Why is that a bad understanding of how people are         understanding  people are supposed to do it? Why is it not fair understanding of how people are supposed to
judges: Rogers, Srinivasan, Pillard